CHARLESTON TRANSIT COMPANY *et al. v.* ERNEST K. JAMES, STATE TAX COMMISSIONER

(CC 607)

Submitted April 11, 1939. Decided June 20, 1939.

*Howard R. Klostermeyer* and *Price, Smith & Spilman,* for plaintiff.

*Clarence W. Meadows,* Attorney General, and *Ira J. Partlow,* Assistant Attorney General, for defendant.

KENNA, JUDGE:

The Circuit Court of Kanawha County sustained a demurrer to a bill of complaint filed by Charleston Transit Company and The B. F. Goodrich Company, corporations, against Ernest K. James, State Tax Commissioner, the purpose of which was to procure an order restraining the defendant from paying over to the State Treasurer sums of money paid to him by the Goodrich Company in August and September, 1938, being consumers' sales tax

collected from Charleston Transit Company under the provisions of Chapter 108, Acts 1937 (Code 1937, Chapter 11, article 15), and to enjoin the respondent from collecting from either of the complainants consumers' sales or service taxes as the outgrowth of the transaction described in the bill. This certification was made upon the joint petition of the parties.

The contract in question, according to the allegations of the bill of complaint, was entered into at Akron, Ohio, on the first day of June, 1938, and a copy was filed as an exhibit with the bill of complaint. It is quite lengthy, but the substantial provisions affecting the questions now before the Court are those that bind the Bus Company to equip all of its vehicles during the life of the contract (June 1, 1938, to June 30, 1941, unless previously renewed) with Goodrich Silvertown tires to be delivered by the Rubber Company at Akron with freight prepaid to Charleston, West Virginia, the number provided for being one tire for each wheel and one spare tire plus an additional spare tire for each two of the Bus Company's vehicles for the transportation of passengers, the Bus Company to furnish rim equipment subject to the approval of the Rubber Company, title to remain in the Rubber Company free from encumbrance. The Rubber Company assumes the risk of transportation, and further agrees to repair at the Bus Company's expense all damage caused by accident or casualty after the tires are received at the Bus Company's garage.

The Bus Company agrees to maintain an accurate mileage record by means subject to the approval of the Rubber Company and to furnish a statement not later than the tenth day of each month and to make payment for the mileage run by each tire at the rate of fifty-five one-hundreths of a cent per mile, effective until June 30, 1939, the charge thereafter to be altered in accordance with the alteration in the average market price of crude rubber and of clean cotton during the preceding six months. The contract provides that all vehicles for the transportation of passengers bought by the Bus Company

shall be purchased without tires, which shall be supplied by the Rubber Company.

The Rubber Company agrees to maintain and repair all tires delivered to the Bus Company, and to furnish all valves, valve parts, flaps, repair material and labor necessary to maintain and repair the tires furnished, and to mount and dismount all tires and rims or discs, for which service the Bus Company agrees to pay, in addition to the mileage fees provided for their use, the sum of fifty dollars per month.

The Bus Company further agrees that upon the termination of the contract, unless the parties enter into a new mileage contract to become effective at that time, to purchase the casings and tubes on its busses on the basis of the average mileage used in determining the base rate, which at no time shall amount to less than thirty-two thousand miles, times the contract rate then in effect, minus the amount of mileage already paid for, or to continue the use of the tires for a period of one hundred and twenty days and to then purchase them at the foregoing rate.

The contract is not transferable by the Bus Company without the written consent of the Rubber Company.

Paragraph six of the contract stipulates that any increase in the manufacturing or selling costs resulting directly or indirectly from any law or laws in effect at the time of the execution of the contract or thereafter becoming effective, including any tax, excise or levy of whatsoever kind or form imposed upon the sale, manufacture or use of the tires furnished shall be assumed by the Bus Company and paid to the Rubber Company or as the Rubber Company may direct.

The question before us is: Is the transaction represented by this written contract to be construed either as a sale with the Goodrich Company as vendor and the Bus Company as vendee, or as a service other than professional or personal service, and, if it is the former, whether the title passes within the State of West Virginia, and if so, whether it is not an interstate transaction

so that the consumers' sales tax of this state is inapplicable?

The classification of this transaction has been rendered difficult and complicated by an abstruse verbosity which illustrates the importance of going beyond the form and considering only the substance in applying equitable principles. Neither must we lose sight of the fact that though an ambiguity in a statute imposing a tax is to be resolved in favor of the person upon whom the burden otherwise might fall, the same rule does not extend to either an interpretation or a construction of the contract between the Rubber Company and the Bus Company.

The trial chancellor construed the contract to be a contract of sale which contemplates the actual delivery of the tires to the Bus Company in Charleston, West Virginia, because of the fact that the contract contains a stipulation that risks in transit shall be borne by the Rubber Company in consequence of which fact the carrier from Akron, Ohio, to Charleston is the agent of Rubber Company and acting for it when the tires are delivered to the Bus Company in Charleston. We cannot quite follow the trial court's reasoning, since we believe that the parties to a contract, the performance of which involves the services of a carrier, may themselves stipulate and agree as to the agency of the carrier involved. Of course, there may later arise circumstances, such as bills of lading, that may cast some doubt upon the question of agency, but at the present time we have nothing before us but the stipulations of the contract by which delivery in Akron to the Bus Company under a conditional contract of sale, it strikes us, follows inevitably and as a necessary corollary of construing the contract to constitute a sale.

But does the contract represent an actual sale, either absolute or conditional? The opinion of the trial chancellor states that the contract clearly contemplates that the tires are to be used by the Bus Company until they are consumed or are purchased, and that in the event they are serviceable at the expiration of the contract, the

Bus Company must purchase them, the Rubber Company retaining title until such time, and in another part of the opinion it is stated that it seems clear under the provisions of the contract that the tires are not to be returned to the Rubber Company at the end of the contract period. It might also be said that it is clear that the Bus Company does not intend to retain possession unless and until it thereafter purchases the tires. In other words, it strikes us that construing this contract as a conditional sale gives rise to at least two minor questions, neither of which can be answered so as to favor or justify the trial chancellor's conclusion. First, we think that if it was a conditional sale, its *situs* was in Akron, Ohio; second, if the transaction is so regarded, we cannot quite grasp the other terms of the contract which contemplate the further purchase on the part of the Bus Company of tires of which it was already the vendee, for example, passenger vehicles which the Bus Company may sell, and the provision of the contract contemplating purchase by the Bus Company of tires which are not worn out at the end of the contract period.

The bill of complaint alleges that the contract of June 1, 1938, is a renewal of a former contract between the parties dated April 2, 1934, expiring March 31, 1938; that under the former contract there was a stipulated monthly amount to be paid to the Rubber Company for services rendered the Bus Company, which the bill admits was subject to the consumers' sales tax, obviously as a service tax. The bill goes on to allege that under the former contract of April 2, 1934, the mileage charge and the service charge could not be segregated and that for that reason the amount of the consumers' sales tax paid under the former contract was applicable both to compensation paid for services and to the mileage charge. The plain inference is that the contract exhibited with the bill of complaint was drawn with the notion that the fifty dollars a month service charge should be segregated from the mileage charge in a way that would make the consumers' sales tax apply to the former and would clearly

exempt the latter. We are of the opinion that that has not been accomplished.

. As we view the contract in question and the allegations of the bill of complaint the transaction cannot be regarded as a conditional sale by the Rubber Company to the Bus Company. No title nor consideration passed, and the only element of a sale present was delivery in Akron by the Rubber Company to the Bus Company of enough casings to meet its then existing requirements. There was no definite purchase price that the Bus Company was then obligated to pay, and had it ceased to do business as a carrier of passengers its obligations would have ceased co-incidentally.

Neither do we believe that the contract can be construed as a contract of rental. In part, the foregoing reasons applicable to a contract of sale are relevant to a contract of rental. There is no specific basis upon which a term may be fixed. Neither is there any provision for the upkeep of the property by the lessee or for its return to the lessor, excepting when the tires have been run thirty-two thousand miles, at which time, we believe, common experience teaches that the tires would be practically worn out. The length of time contemplated for the property to be in the possession of the Bus Company is not one of the material elements of the contract. The use of the property and the wear inflicted upon it doubtless is.

It is a very interesting digression to refer to the fact that our consumers' sales tax mentions not only a service tax but also a tax for the use of tangible personal property, and that the Supreme Court of the United States in the following case has sustained the validity of such a tax. *Henneford* v. *Silas Mason Co., Inc.,* 300 U. S. 577, 81 Law Ed. 814, 57 S. Ct. 524.

We think that for the foregoing reasons, this contract . cannot be classified either as a sale or a rental, and that fact, coupled with the fact that the contract gives the Rubber Company the exclusive privilege of repairing the tires used on the Bus Company's motor vehicles which

carry passengers and keeping them supplied with wheel treads in good repair and free from any dangerous defects, while realizing the difficulty of segregating the different elements of the contract as set up in the bill, leads us to the conclusion that it is to be regarded as a contract of service, and that the physical possession of the tire casings and the circumstances under which that possession was acquired are simply incidental.

For the foregoing reasons we affirm the decree of the Circuit Court of Kanawha County.

*Affirmed.*

RILEY, JUDGE, dissenting:

With regret, I find myself unable to entertain the views adopted by the majority of this Court. True, as suggested in the majority opinion, the decision of this case properly rests on whether the contract in question provides for a sale of tires and equipment or the rendering of services by the tire company to the transit company. In the former case, the transaction is so tinged with interstate commerce as to be non-taxable; in the latter, inasmuch as the services, if such they are, necessarily must be rendered within the State of West Virginia, the transaction would be taxable.

I find it difficult to see how the instant transaction does not constitute a sale which involves interstate commerce. The contract was made in Akron, Ohio; it provides that the tire company will deliver tires and equipment for the transit company's buses "transportation facilities Akron, Ohio, freight prepaid to Charleston, W. Va."; that all tires lost, stolen or damaged beyond repair after delivery shall be charged to the transit company on a mileage basis; that all tires furnished under the contract shall be paid for on a mileage basis; that at no time shall the total mileage amount to less than 32,000 miles; and, further, that in the event the contract is not renewed, the bus company shall purchase the tires on a mileage basis. It thus appears under the provisions of this con-

tract that the title to the tires eventually will pass out of the tire company, either by purchase for cash or usage payable on a mileage basis, and this must happen within the State of West Virginia. Thus we have a contract, between New York and West Virginia corporations, made in Ohio, which provides for delivery in Ohio of tires to the West Virginia corporation for transportation to West Virginia, the title to which will pass upon contingencies which must happen in West Virginia. Under the circumstances, I think that the interstate commerce feature is part and parcel of the whole transaction to such an extent that the West Virginia consumers' sales tax (Acts 1937, chapter 108) has no application except as to the services for repair and maintenance on the basis of fifty dollars per month as provided by Section 8 of the Act.

Judge Hatcher joins in this dissent.